**M.D. THOMSON and Austin Banister Joint Venture, Appellants,**

v.

**ESPEY HUSTON & ASSOCIATES, INC., Appellee.**

No. 03–94–00040–CV.

Court of Appeals of Texas, Austin.

May 24, 1995.

---

Earl L. Yeakel, III, Clark, Thomas & Winters, Austin, for appellants.

Diane M. Henson, Austin, for appellee.

Before JONES, KIDD and B.A. SMITH, JJ.

JONES, Justice.

Appellants M.D. Thomson and Austin Banister Joint Venture (collectively "Thomson") sued appellee Espey Huston & Associates, Inc. ("Espey") for breach of contract and negligence arising out of Espey's role in the construction of an apartment complex. The trial court granted summary judgment in favor of Espey on all causes of action. We will affirm in part and reverse in part.

## FACTUAL AND PROCEDURAL BACKGROUND

In June 1985, M.D. Thomson entered into a joint venture with Gary Woodard and Morris Hamilton for the purpose of developing real estate. The resulting entity, Austin Banister Joint Venture, contracted with the Hamilton–Woodard Company, a partnership between Woodard and Hamilton, for the construction of an apartment complex on a tract of land owned by Thomson. Hamilton–Woodard, in turn, entered into two contracts with Espey, an engineering consulting firm.

The first of these contracts, the "Scope of Services Contract," engaged Espey to perform a variety of engineering and design services in connection with the construction. Among other functions, Espey was responsible for designing drainage structures, facilities for controlling storm water runoff, and "on site" water and wastewater distribution and collection systems. Espey was also responsible for testing soil quality and providing certain foundation and pavement recommendations.

The second contract, the "Draw Inspection Contract," was required by a loan agreement between Austin Banister Joint Venture and one of its creditors. The agreement required the joint venture to hire an independent contractor to periodically inspect the construction site and report on whether the construction was proceeding according to plan. Satisfactory inspection reports were a condition to continued financing. Under the Draw Inspection Contract, Espey agreed to perform these inspections for approximately $120.00 to $150.00 per draw application.

By July 1986, Espey had performed all of its services, and the apartment complex was substantially complete. Over the next two years, Thomson says, it became apparent that the complex was riddled with design and construction defects.[1] These defects included problems related to drainage and water runoff.

On October 6, 1988, Thomson, on his own behalf and on behalf of the joint venture, filed suit against Espey[2] alleging breach of both the Scope of Services Contract and the Draw Inspection Contract, and also alleging that Espey was negligent in performing its

---

1. Plaintiffs' Original Petition alleges, among other defects, "933 individual items of deficient construction" in the interiors of the apartment units.

2. Thomson also named Woodard, Hamilton, and the Hamilton–Woodard Company as defendants. Thomson's claims against those defendants were severed after Woodard and Hamilton filed for bankruptcy.

duties under those contracts. Espey moved for summary judgment, arguing that: (1) neither Thomson nor the joint venture were in privity with Espey or were third-party beneficiaries, and therefore neither could sue Espey for breach of contract; (2) Thomson's negligence claims were barred by the economic loss rule; (3) Thomson's negligence claims were barred by the statute of limitations; and (4) Thomson's claims based on faulty construction were barred by the doctrines of waiver and estoppel. The trial court granted summary judgment in favor of Espey on all causes of action. Thomson challenges the summary judgment in six points of error.

## DISCUSSION

The standards for reviewing a summary judgment are well established: (1) The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law; (2) In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true; (3) Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). The purpose of summary judgment is to eliminate patently unmeritorious claims or untenable defenses, not to deprive litigants of their right to a full hearing on the merits of any real issue of fact. *Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929, 931 (Tex.1952).

### A. Breach of Contract Claims

Thomson alleges that Espey breached both contracts. However, Thomson is not a party to either of them; both are between Espey and Hamilton–Woodard. Thomson seeks recovery under his breach-of-contract theories solely as a third-party beneficiary. A third party may recover on a contract made between other parties only if the parties intended to secure some benefit to that third party, and only if the contract-ing parties entered into the contract directly and primarily for the third party's benefit. *Dorsett Bros. Concrete Supply, Inc. v. Safeco Title Ins. Co.*, 880 S.W.2d 417, 421 (Tex. App.—Houston [14th Dist.] 1993, writ denied). Moreover, there is a presumption against third-party beneficiary agreements. *Corpus Christi Bank & Trust v. Smith*, 525 S.W.2d 501, 503–04 (Tex.1975) ("[W]e must begin with the presumption that parties contract for themselves, and a contract will not be construed as having been made for the benefit of third parties unless it clearly appears that such was the intention of the contracting parties."). For Thomson to prevail on his contract claims, the intent to benefit him must be clearly apparent; any doubt must be resolved against finding that he is a third-party beneficiary. *See Dorsett Bros.*, 880 S.W.2d at 421.

With respect to the Scope of Services Contract, Thomson relies on two provisions. First, the contract required the joint venture to provide Espey with certain information necessary for its engineering services. Second, the contract's title indicates that the construction project in question is located on property owned by Thomson.[3] These aspects of the contract, he argues, designate him as a third-party beneficiary.

In support of his position, Thomson relies on *Rudolph v. ABC Pest Control, Inc.*, 763 S.W.2d 930 (Tex.App.—San Antonio 1989, writ denied). In *Rudolph*, a home-seller agreed to provide the buyer with a written termite inspection report on the house. The seller hired ABC Pest Control, which inspected the premises and reported that there were no active termite infestations. *Id.* at 931. Later, the buyer discovered an infestation that had apparently been present at the time of the inspection. *Id.* at 931–32. The court held that the buyer was a third-party beneficiary of the contract between the seller and the inspector, reasoning that: "[A]lthough the contract did not specifically state that the plaintiffs were the intended beneficiaries of the contract, it was sufficient that the contract was evidently made for the benefit of third persons." *Id.* at 934 (quoting

---

**3.** The full title of the contract is "Scope of Services and Fee Schedule for Consulting Engineer-ing Services Associated with the 9.8–Acre Tract Known as Garden Villa Estates."

*Johnson v. Wall,* 38 N.C.App. 406, 248 S.E.2d 571, 574 (1978)).

█ The standard used by the *Rudolph* court ("evidently made for the benefit of third persons"), incorporated from a North Carolina intermediate appellate court opinion, is arguably more liberal than other Texas case law, which stresses that the intent to benefit a third party must be clearly apparent from the contract itself. *See, e.g., Corpus Christi Bank & Trust,* 525 S.W.2d at 503–04; *Tennessee Gas Pipeline Co. v. Lenape Resources Corp.,* 870 S.W.2d 286, 295 (Tex. App.—San Antonio 1993, writ granted); *Brunswick Corp. v. Bush,* 829 S.W.2d 352, 354 (Tex.App.—Fort Worth 1992, no writ); *Bruner v. Exxon Co., U.S.A.,* 752 S.W.2d 679, 683 (Tex.App.—Dallas 1988, writ denied). Without deciding whether the standard applied by the *Rudolph* court may be correct in other contexts, we conclude that the present case is governed by the generally prevailing rule that, in the construction context, a property owner is ordinarily not a third-party beneficiary of a contract between the general contractor and a subcontractor.

The relationships between property owners, general contractors, and subcontractors are well established under generally prevailing contract principles. A leading treatise on contract law explains:

> Such contracts [between a principal building contractor and subcontractors] are made to enable the principal contractor to perform; and their performance by the subcontractor does not in itself discharge the principal contractor's duty to the owner with whom he has contracted. The installation of plumbing fixtures or the construction of cement floors by a subcontractor is not a discharge of the principal contractor's duty to the owner to deliver a finished building containing those items; and if after their installation the undelivered building is destroyed by fire, the principal contractor must replace them for the owner, even though he must pay the subcontractor in full and has no right that the latter shall replace them. It seems, therefore, that the owner has no right against the subcontractor, in the absence of clear words to the contrary. The owner is neither a creditor beneficiary nor a donee beneficiary; the benefit that he receives from performance must be regarded as merely incidental.

4 Arthur L. Corbin, *Corbin on Contracts* § 779D, at 46–47 (1951). The Restatement (Second) of Contracts endorses the same rule by way of an illustration: "*A* contracts to erect a building for *C*. *B* then contracts with *A* to supply lumber needed for the building. *C* is an incidental beneficiary of *B*'s promise, and *B* is an incidental beneficiary of *C*'s promise to pay *A* for the building." Restatement (Second) of Contracts § 302, illus. 19 (1979).

This general rule is grounded in the respective interests of the property owner, general contractor, and subcontractors. The contract between the property owner and the general contractor gives the property owner the right to a finished building. Subsequent contracts between the general contractor and subcontractors add nothing to this entitlement; the owner is still entitled to the same building, regardless of the means by which it is constructed. These same subcontracts, however, are vital to the interests of the general contractor, who has assumed the obligation to deliver a finished building. In most cases, subcontracts will be necessary to enable the general contractor to deliver the building and avoid liability for breach of contract. This need, rather than the interests of the property owner who is entitled to a finished building both before and after the subcontract, is the primary motivation for subcontracting.

For their part, subcontractors are selected by the general contractor. Usually, it is the general contractor who assigns them tasks, negotiates and signs their contracts, monitors their performance, and pays them on completion. If the subcontractors' performance falls short of what the owner is entitled to, it is the general contractor who has to make up the difference. From the subcontractors' perspective, as well as the general contractor's, subcontracts are intended primarily to benefit those parties rather than the property owner. We conclude that, absent clear evidence to the contrary, a property owner is not a third-party beneficiary of a

contract between the general contractor and a subcontractor. *See B & C Constr. Co. v. Grain Handling Corp.*, 521 S.W.2d 98, 101 (Tex.Civ.App.—Amarillo 1975, no writ).[4]

█ In the present case, there is no such clear evidence. While Thomson benefited indirectly from the Scope of Services Contract, real estate development almost always benefits the property owner. However, this merely establishes that Thomson was an *incidental* beneficiary, and incidental beneficiaries may not sue on a contract. *Mandell v. Hamman Oil & Ref. Co.*, 822 S.W.2d 153, 161 (Tex.App.—Houston [1st Dist.] 1991, writ denied). In order to be entitled to sue on the contract, Thomson would have to establish not only that he benefited from the contract, but also that Hamilton–Woodard and Espey contracted *directly* and *primarily* for his benefit. *See Dorsett Bros.*, 880 S.W.2d at 421. We presume that Hamilton–Woodard and Espey did not do so, and the contractual provisions to which Thomson points are insufficient to overcome that presumption.

█ The Draw Inspection Contract provides even less support for Thomson's claim to be a third-party beneficiary. That contract was entered into at the insistence of the bank, ostensibly for its own benefit. In that respect it is clearly distinguishable from *Rudolph*, where the contract in question was specifically demanded by the party claiming third-party beneficiary status. *See* 763 S.W.2d at 931.

Furthermore, the contract itself contains no mention of Thomson or his property. Thomson bases his argument on a single provision indicating that the draw inspections are being performed "for compliance of the loan agreement for this project." By this reference, he contends, the contract "incorporates the terms of and reflects [Espey's] knowledge of the Construction Loan Agreement," and thereby designates Thomson as a third-party beneficiary. We are not persuaded. Thomson offers no compelling reason why a simple reference to the loan agreement should be interpreted as an incorporation of all of its terms, or why such an incorporation would necessarily designate him as a third-party beneficiary. Mere knowledge that Thomson would benefit from the draw inspections is insufficient to support Thomson's claims to be a third-party beneficiary. The critical inquiry is whether it is *clearly apparent* that Hamilton–Woodard and Espey contracted directly and primarily to benefit Thomson. With respect to both the Scope of Services Contract and the Draw Inspection Contract, we conclude that such purpose is not clearly apparent. Points of error two and three are overruled.

## B. Tort Claims and the Economic Loss Rule

█ The distinction between contract and tort actions is not always entirely clear. *See generally* William Powers, Jr. & Margaret Niver, *Negligence, Breach of Contract, and the "Economic Loss" Rule*, 23 Tex.Tech. L.Rev. 477 (1992). Outside of certain special contexts, such as insurance contracts, the mere breach of a contract is not a tort. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992); *Adolph Coors Co. v. Rodriguez*, 780 S.W.2d 477, 481–82 (Tex.App.—Corpus Christi 1989, writ denied). However, the mere fact that an act is done pursuant to a contract does not shield it from the general rules of tort liability. Depending on the circumstances, a party's acts may breach duties in tort or contract alone or simultaneously in both. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986).

█ The nature of the injury suffered generally determines the existence of a cause of action in tort. *Id.* When the injury consists only of economic loss to the subject of

---

4. With regard to the subcontract at issue in that case, the *B & C Construction* court noted that "there is nothing in the instrument pertaining to, or stating that the building was being constructed for, Grain Handling [the owner]." 521 S.W.2d at 101. We do not interpret this to mean that third-party beneficiary status can be established merely by a showing that the contract contains language "pertaining to," or indicating that a building is being constructed for, a third party. Indeed, *B & C Construction* reaffirms the "clearly apparent" standard later in the same paragraph. *Id.* at 101–02 ("Thus, it does not clearly appear from the terms of the subcontract itself that the contracting parties intended it was made for the benefit of Grain Handling.").

the contract itself, the action sounds in contract alone. *Id.* It is also instructive to examine the duties that the defendant has allegedly breached. If the defendant's conduct would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex.1991). Conversely, if the defendant's conduct would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract. *Id.*

The distinction between violating a contractual duty and violating the common-law duty of due care is illustrated by *Montgomery Ward & Co. v. Scharrenbeck*, 204 S.W.2d 508 (Tex.1947). In *Scharrenbeck*, the defendant was hired to repair a water heater in plaintiff's attic. *Id.* at 508–09. When the heater subsequently malfunctioned and ignited the roof, destroying the house and its contents, the plaintiff sued in tort. *Id.* at 509. The supreme court held that the defendant's negligence in repairing the heater gave rise to a tort claim despite the contractual context, noting that "[a] contract may create the state of things which furnishes the occasion of a tort." *Id.* at 510. The Texas Supreme Court recently summarized and reaffirmed the rationale of *Scharrenbeck:*

> Although the contract obligated the defendant to put the water heater back in good working order, the law also implied a duty to the defendant to act with reasonable skill and diligence in making the repairs so as not to injure a person or property by his performance. In failing to repair the water heater properly, the defendant breached its contract. In burning down plaintiff's home, the defendant breached a common-law duty as well, thereby providing a basis for plaintiff's recovery in tort.

*DeLanney*, 809 S.W.2d at 494.

■ It appears that Espey's negligence, if any, in performing the Draw Inspection Contract caused no injury beyond economic loss to the subject of the contract itself. The purpose of the contract was to provide certain assurances that the construction would go according to plan.[5] Thomson now complains that these measures failed, and that as a result the building is defective. This injury—the mere failure to receive the benefit of the bargain—does not give rise to a tort cause of action. Examination of the duties involved supports this conclusion. Absent the contract, Espey had no duty whatsoever to inspect the construction site, or even to report problems it inadvertently discovered. Consequently, Espey's performance under the contract, however negligent, could violate only a contractual duty unless, as in *Scharrenbeck*, the negligence caused damage beyond the subject of the contract itself.

The court's reasoning in *2314 Lincoln Park West Condominium Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 136 Ill.2d 302, 144 Ill.Dec. 227, 555 N.E.2d 346 (1990), cited by Espey, also supports our conclusion. In that case, the Illinois Supreme Court concluded that the economic loss rule barred tort recovery against an architectural firm for defects in a building it had designed: "'Economic loss' has been defined as 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—*without any claim of personal injury or damage to other property* ....'" *Id.* at 229, 555 N.E.2d at 348 (emphasis added) (quoting *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (Ill.1982)). The court concluded that since the plaintiff complained only of inadequacies in the building that was the subject of the contract, the plaintiff could recover only in contract. 144 Ill.Dec. at 231–32, 555 N.E.2d at 350–51.

■ In contrast, Espey's alleged negligence in performing the Scope of Services Contract may give rise to a tort cause of action. Thomson alleges that Espey's negligence in designing the drainage system and testing soil quality has caused damage to other parts of the apartment complex. Specifically, he alleges that certain buildings suf-

---

5. There is some dispute as to the precise scope of Espey's inspection duties under the contract. However, this disagreement is not material to our consideration. The important point is that the subject of the contract was some degree of assurance that the construction would go according to plan.

fer from "cracking walls, doors which will not fit properly, mildew, standing water, shifting and other problems." He further alleges that the drainage plan was designed in such a way that water pools form in one area of the complex, blocking a street and spilling onto adjacent property.

Such damage is beyond the subject of the contract itself, distinguishing this case from *Jim Walter Homes,* wherein the defendant was contractually obligated to provide the entire house. *See Jim Walter Homes,* 711 S.W.2d at 617. If Thomson were merely complaining that the drainage system was inadequate and that he had been forced to repair or improve it, he would have only a contractual claim. Likewise, if Thomson were merely complaining that the soil testing services were inadequate and that he had been forced to supplement Espey's services at his own expense, he would have only a contractual claim. However, to the extent that the alleged inadequacies caused damage to parts of the property beyond Espey's contract, Thomson also has a tort claim.

Again, examination of the duties involved supports this conclusion. In *Jim Walter Homes,* the plaintiff's right to the house derived entirely from his contract with the defendant. Here, on the other hand, the contract with Espey provides only one portion of a larger whole, and damage to other parts of the complex is not merely economic loss to the subject of the contract itself. The Scope of Services Contract imposed on Espey a contractual duty to perform specified services for Hamilton–Woodard. At the same time, however, Espey had an independent duty not to negligently damage Thomson's property or the property of his neighbors. If, as Thomson alleges, incompetent engineering services have damaged his building, then Espey may be liable for that negligence in tort.

We hold that, because of the economic loss rule, summary judgment was appropriate with respect to Thomson's negligence claims related to Espey's services under the Draw Inspection Contract. Likewise, Thomson's tort causes of action for negligent misrepresentation and fraud derived from the Draw Inspection Contract are also barred by the economic loss rule. We overrule the portion of point of error five relating to tort claims arising from the Draw Inspection Contract.[6] However, we sustain the portion of Thomson's fifth point of error concerning tort actions arising from the Scope of Services Contract.

## C. Statute of Limitations

As an independent ground for summary judgment, Espey argues that Thomson's negligence claims are barred by the two-year statute of limitations. Tex.Civ.Prac. & Rem. Code Ann. § 16.003 (West 1986). Espey performed all of its services by July 1986, when the apartment complex was substantially complete; Thomson did not file suit until October 1988. Thomson argues that despite the lapse of more than two years, his negligence actions are not barred because the statute of limitations was tolled by the discovery rule.

For purposes of application of a statute of limitations, a cause of action generally accrues when the wrongful act causes an injury, regardless of when the plaintiff learns of the injury. *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990). The discovery rule is an exception to this general rule. *Id.* When applicable, the discovery rule provides that the limitations period runs from the date the plaintiff discovers or should, in the exercise of reasonable care and diligence, have discovered the nature of his injury. *Id.; Snyder v. Eanes Indep. Sch. Dist.,* 860 S.W.2d 692, 699 (Tex.App.—Austin 1993, writ denied). However, the discovery rule applies

---

6. Espey also moved for summary judgment on the ground that any defective construction techniques Espey should have discovered in performing its inspections were techniques implemented by, and thus fully known to, Woodard and Hamilton. Espey asserted that such knowledge, being known to Woodard and Hamilton, must be imputed to Thomson and, therefore, Thomson

waived or is estopped from making any negligence claims regarding Espey's inspection services. Thomson's sixth point of error challenges this ground. Since we will affirm the summary judgment with respect to all causes of action arising out of Espey's inspection services, we need not address the issues raised by point of error six.

only to causes of action that can be characterized as "inherently undiscoverable," such as fraud, credit libel, and medical and legal malpractice. *Snyder,* 860 S.W.2d at 699–700. The discovery rule is appropriate for these causes of action because it is inherently difficult for the injured party to learn of the negligent act or omission. *Id.* at 700.

 We believe that an action for negligence in the performance of engineering services qualifies for application of the discovery rule. Engineering consultants are hired precisely because ordinary persons—even general contractors—may be unable to distinguish suitable drainage systems from unsuitable ones. Having engaged an engineer to remedy his own lack of expertise, a general contractor cannot be expected to assess the competence of the engineer's work before there is an opportunity to test the final product. In this case, the summary judgment evidence did not conclusively establish that a layperson could perceive any problems with Espey's services before the flooding occurred and the damage to the buildings became manifest. We sustain point of error four with regard to the discovery rule tolling the statute of limitations as to claims of negligence in Espey's performance of the Scope of Services Contract.[7]

## CONCLUSION

We reverse the trial court's judgment as to Thomson's negligence claims relating to Espey's services performed under the Scope of Services Contract, and we sever and remand that portion of the cause to the trial court for further proceedings. We affirm the remainder of the judgment.

---

**7.** Thomson's first point of error is simply a *Malooly Brothers* point which, given our discussion of points of error two through six, requires no

additional analysis by this Court. *See Malooly Bros., Inc. v. Napier,* 461 S.W.2d 119, 121 (Tex. 1970).